[Cite as *Snyder v. Manuel*, 2012-Ohio-5951.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

JESSICA SNYDER, INDIVIDUALLY AND
AS PARENT NATURAL GUARDIAN AND
NEXT FRIEND OF COLTYN MEISNER,
A MINOR CHILD, ET AL.,

                                                      CASE NO. 5-11-39

    PLAINTIFFS-APPELLANTS,

    v.

MICHAEL MANUEL, M.D.,                      O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2010 CV 00069

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: December 17, 2012

APPEARANCES:

    *Timothy J. Walerius and Ronald Simon* for Appellants

    *Jeanne M. Mullin and David R. Hudson* for Appellee

Case No. 5-11-39

**ROGERS, J.**

{¶1} Plaintiffs-Appellants, Jessica Snyder ("Snyder") and her minor child, Coltyn Meisner, (collectively "Plaintiffs"), appeal the judgment of the Court of Common Pleas of Hancock County granting Defendant-Appellee, Dr. Michael Manuel ("Dr. Manuel"), a directed verdict. On appeal, Plaintiffs contend that the trial court erred in granting Dr. Manuel a directed verdict, and that the trial court erred by limiting the testimony of their expert, Dr. Bruce Janiak. Based on the following, we affirm in part and reverse in part the trial court's judgment.

{¶2} At approximately 8:00 a.m. on February 13, 2009, Snyder, a 39-year-old woman and registered nurse, began, as she described, "having weird feelings" in her arm, jaw, and back as she was driving to work in Findlay. Trial Tr., p. 436. Upon the onset of these feelings, Snyder pulled into the nearest parking lot and called Dr. Manuel, a hospitalist with Blanchard Valley Regional Health Center (the "hospital") and with whom she was professionally acquainted.[1] The call was placed at 8:23 a.m. At trial, Snyder could not recall the exact symptoms she conveyed to Dr. Manuel over the phone. But, she did agree with the following recitation of her deposition testimony as accurately describing the symptoms she communicated to Dr. Manuel during the phone call:

---

[1] Hospitalist is defined as "a physician who specializes in treating hospitalized patients of other physicians in order to minimize the number of hospital visits by other physicians." Merriam-Webster (2012), http://www.merriam-webster.com/dictionary/hospitalist, (accessed Dec. 11, 2012).

-2-

Q: You told me that - - when you described what you first told [Dr. Manuel] on that phone call that morning, you indicated that it started with your fingers in your left hand going numb and tingly. That it went up to your left arm going numb and tingly. That your jaw became numb and tingly. That you were in the most horrific pain of your life between your shoulder blades. That you became diaphoretic, meaning you were sweating and everything was getting wet. That you felt nauseous. That you looked in the mirror, your face was ashen and you looked dead. And that you feared you were going to die. Trial Tr., p. 520.

Though Dr. Manuel did not testify at trial about the contents of the phone call, he maintains that Snyder only told him that she had "abdominal pain, nausea, vomiting, and diarrhea[.]" Appellee's Br., p. 3.[2] After describing her symptoms to Dr. Manuel, Snyder testified that he told her to meet him in the hospital's admissions office where he would admit her. Dr. Manuel, on the other hand, maintains that he told Snyder to go to the emergency room, as opposed to the admissions office.[3] After several minutes on the phone, Snyder informed Dr. Manuel that she had to hang-up and go into a nearby store because of diarrhea. Accordingly, the conversation ended and Snyder went to the store to relieve her diarrhea. After she regrouped, she drove to the hospital.

---

[2] We can find no evidence supporting Dr. Manuel's assertion that the only symptoms Snyder told him over the phone were abdominal pain, nausea, vomiting, and diarrhea. Accordingly, as the record stands, there is no factual dispute concerning the symptoms Snyder told Dr. Manuel over the phone. Even if there was a factual dispute, as Dr. Manuel asserts, we must, for the purposes of this appeal, accept Plaintiffs' version of events as true.

[3] We can find no evidence supporting Dr. Manuel's assertion that he told Snyder to go to the emergency room over the phone. In fact, in his answer, Dr. Manuel admitted to the allegation that he told Snyder to meet him at the admission's office. (Docket No. 16, p. 3). Accordingly, as it stands, there is no factual dispute concerning where Dr. Manuel told Snyder to go for treatment. Even if there was a factual dispute, as Dr. Manuel asserts, we must, for purposes of this appeal, accept Plaintiffs' version of events as true.

{¶3} At approximately 9:19 a.m., Snyder arrived in the admissions office, where she met with Dr. Manuel. Though the exact time when Snyder met with Dr. Manuel in the admissions office is disputed, there is no dispute that Snyder signed a consent to treatment form at 9:25 a.m. and that Dr. Manuel was her admitting physician. According to Snyder, when she met Dr. Manuel in the admissions office she told him about the same "symptoms that [she] had told him on the phone." Trial Tr., p. 443. Dr. Manuel, however, testified that "when [Snyder] reported to the hospital" she informed him that she was suffering from "intractable nausea, vomiting, [and] diarrhea." Trial Tr., p. 170. Sometime between meeting Snyder in the admissions office and 9:57 a.m., Dr. Manuel filled out a physician's order form (Plaintiffs' Exhibit 4), in which he noted that Snyder was admitted for intractable nausea, vomiting, renal failure, and anemia, and ordered several tests to determine the cause of those conditions.

{¶4} After being admitted and meeting with Dr. Manuel, Snyder arrived on the hospital's floor as an inpatient at approximately 10:00 a.m. According to Snyder, she did not see Dr. Manuel again until sometime after 5:00 p.m. Dr. Manuel, however, testified that he met with Snyder between 11:00 a.m. and 11:30 a.m. to take her history and conduct a physical examination. According to Dr. Manuel, Snyder did not complain of jaw, arm, and shoulder pain during that meeting.

{¶5} At approximately 6:00 p.m., Snyder's family physician visited Snyder in the hospital and filled out a physician order form (Plaintiffs' Exhibit 7) ordering several cardiac tests, including but not limited to, an electrocardiogram ("EKG") and a cardiac enzyme panel. The results from the EKG and cardiac enzyme panel, which were available at 6:45 p.m. and 6:47 p.m. respectively, indicated that Snyder was and had been suffering from a heart attack. It was later determined that Snyder's heart attack was caused by a complete occlusion of her left anterior descending coronary artery ("LAD artery"). Snyder was transferred to the cardiac care unit at 7:48 p.m. Trial Tr., p. 311-2, *see also* Trial Tr., p. 468. Though it is not clear when the procedure to open the occlusion in the LAD artery began, it is undisputed that the LAD artery was opened at approximately 10:13 p.m.

{¶6} On February 2, 2010, Snyder, individually and as parent, natural guardian, and next friend of Coltyn Meisner, a minor, and Ann Scott, Snyder's mother, filed a complaint for medical malpractice against Dr. Manuel.[4] Specifically, Snyder alleged that Dr. Manuel was negligent in his care and treatment by failing to timely diagnose her heart attack. As a direct and proximate result of Dr. Manuel's alleged negligence, Snyder claimed that she suffered

---

[4] In addition to Dr. Manuel, the complaint also named Blanchard Valley Regional Health Center, Blanchard Valley Medical Associates, Inc., and Dr. Randell Huff as defendants. These defendants, however, were voluntarily dismissed by Plaintiffs prior to trial. (Docket Nos. 78 & 132). Ann Scott was also dismissed from this matter prior to trial. October 17, 2011 Judgment Entry, p. 1.

damages, including but not limited to, irreparable injury to her heart, emotional distress, loss of earning capacity, and medical expenses.

{¶7} The matter proceeded to a jury trial in September 2011. Plaintiffs presented three medical experts during their case-in-chief. Dr. Thomas Masterson ("Dr. Masterson"), a hospitalist, offered testimony on the issues of duty and standard of care. Dr. Masterson testified that an admitting physician is responsible for, at least, the initial care and treatment of the patient he or she admitted to the hospital. After reviewing the medical records associated with Snyder's heart attack, it was Dr. Masterson's opinion that Dr. Manuel did not meet the standard of care in treating Snyder. Given the symptoms Snyder allegedly communicated to Dr. Manuel over the phone and presented in the admissions office, Dr. Masterson testified that Dr. Manuel breached the standard of care by failing to "immediately have [Snyder] worked up for a heart attack" and admitting her to the a "regular medical floor * * * without having taken the test to find out whether [Snyder] was having a heart attack[.]" Trial Tr., p. 303, 305. Dr. Masterson further testified that "[t]he standard of care for [an] acute heart attack is aspirin when you first see the patient, and getting them to [the] cardiac catheterization laboratory in under 45 minutes." Trial Tr., p. 311.

{¶8} Dr. Bruce Janiak ("Dr. Janiak"), an emergency physician, testified, and Dr. Manuel agreed, that "[t]hings occur much more rapidly in the emergency

department than they do on a general medical floor in a hospital[.]" Trial Tr., p. 201. According to Dr. Janiak, current guidelines set by the American Heart Association and the American Society of Chest Pain Centers provide that a patient being treated for a heart attack in a hospital's emergency department should ideally have the occlusion causing the heart attack opened within ninety (90) minutes of the patient entering the emergency department. Dr. Janiak, however, acknowledged that this guideline cannot always be met due to the varying circumstances of each heart attack case.

{¶9} Dr. Raymond Magorien ("Dr. Magorien"), a cardiologist, offered testimony on the issue of causation. Based on Snyder's medical records, Dr. Magorien testified that her heart attack was caused by a complete occlusion of her LAD artery. In his opinion, the LAD artery was completely occluded at the onset of the heart attack. Though Dr. Magorien conceded that he was not able to pinpoint the exact time when Snyder's heart attack began, he testified that based on Snyder's symptoms and medical records, specifically the EKG reading and cardiac enzyme panel, it was his opinion that Snyder's heart attack began in the morning with the onset of her symptoms. On direct examination, Dr. Magorien was asked to explain the injury experienced by the heart during a heart attack, resulting in the following colloquy:

> A: The majority of heart injury occurs in the first hour or two.
> Between three and four hours there is likely some on-going injury.

> Beyond three and four hours, it's pretty minimal, most of the damage is already completed. But there can be some salvage as late as four to five hours into the heart attack, but it's fairly minimal.
>
> Q: And you told me actually five and a half hours at your deposition
>
> A: In some cases if there is off and on flow, in total occlusion the vast majority of injury occurs in the first two to three hours. Trial Tr., p. 35.

{¶10} On cross-examination, Dr. Magorien was again asked to explain the injury experienced by the heart during a heart attack, resulting in the following colloquy:

> A: When the heart [is] starved of oxygen, there are a lot of things that happen but the heart tissue is very sensitive to blood supply. And within 15 to 30 minutes the heart tissue can start to show changes that are characteristic of diminished or no blood supply. By 30 to 60 minutes you actually get irreversible damage [of the heart tissue]. * * * [W]hen you have a total obstruction with a plaque and then a clot on top of it, likely no collaterals, that process of irreversible damage is very rapid, 30, 60, 90, by 120 minutes you get a major amount of irreversible damage. It may continue out through four or five hours, beyond four hours there is no evidence that treatment improves survival from the initial clinical trials because the damage is irreversible and very extensive at that time. Trial Tr., p. 47-8.

After this explanation, Dr. Magorien was asked whether it was probable that all of the clinically significant injury to Snyder's heart had occurred within four hours of the onset of the heart attack, resulting in the following colloquy:

> A: Well, I will reiterate what I said. One hundred percent obstruction in the evening, the EKG, the blood tests, the clinical course suggested that this was a total blockage with rapidly progressing irreversible heart muscle injury. The vast majority of

that injury occurs in the first few hours. So by the time you get out to four to five hours, there may be some potential for reversing injury but not much, in terms of any clinical impact, the majority of the injury has already occurred. * * *

* * *

Q: * * * Based on what you just indicated, your training, your experience, the studies that you have referred to that have been well-established in your field, knowing the type of lesion that she presented with and that she had, the fact that she did not have any collateral vessels that would have been supplying blood supply to this heart, would you agree with me to a reasonable degree of probability that all of the damage that was done to her heart, at least clinically significant damage, was done in that four hour time window that we just discussed?

* * *

A: Yes, I would. Trial Tr., p. 49-50.

{¶11} Also on cross-examination, Dr. Magorien was asked about the time it would take to open a complete occlusion, resulting in the following colloquy:

Q: From everything that you've reviewed in this case, Dr. Magorien, can we agree that a 90 minute goal was not realistic for Miss Snyder?

A: Based on the comorbidities and everything involved, the fact that it took longer than 90 minutes would be anticipated.

* * *

Q: And knowing all of the complicating factors in terms of [Snyder's] medical history and comorbidities, [it does not surprise you that it took three hours and twenty eight minutes to open the occlusion after receiving a positive EKG reading], does it, Dr. Magorien?

A: It does not. Trial Tr., p. 53-54.

{¶12} At the close of Plaintiffs' case-in-chief, Dr. Manuel moved for directed verdict arguing that Plaintiffs' expert testimony did not establish a causal link between his alleged negligence and Plaintiffs' damages. The trial court subsequently granted Dr. Manuel's motion, finding that the Plaintiffs' failed to present evidence which could reasonably be construed as establishing a causal link between Dr. Manuel's alleged negligence and Plaintiffs' damages.

{¶13} It is from this judgment Plaintiffs appeal, presenting the following assignments of error for our review.

### *Assignment of Error No. I*

**THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT IN FAVOR OF DEFENDANT BECAUSE THE TRIAL COURT IGNORED EVIDENCE THAT MS. SNYDER SUFFERED INJURY AS A DIRECT RESULT OF THE NEGLIGENCE OF DEFENDANT.**

### *Assignment of Error No. II*

**THE TRIAL COURT ERRED IN FINDING PLAINTIFFS PROVIDED NO EVIDENCE OF PROXIMATE CAUSE BECAUSE IT RELIED ON A FAULTY HYPOTHETICAL TO REACH A CONCLUSION THAT THE NEGLIGENCE OF DEFENDANT DID NOT CONTRIBUTE TO THE DELAY IN TREATMENT.**

### *Assignment of Error No. III*

**THE TRIAL COURT ERRED IN ARBITRARILY LIMITING THE TESTIMONY OF PLAINTIFFS' EXPERT AND**

**PREVENTED EVEN FURTHER EVIDENCE OF THE PROXIMATE CAUSE OF INJURY.**

{¶14} Due to the nature of Plaintiffs' assignments of error, we elect to address their first and second assignments of error together.

*Assignments of Error Nos. I & II*

{¶15} In their first and second assignments of error, Plaintiffs essentially argue that construing the evidence in a light most favorable to them the evidence presented at trial could reasonably be construed to establish a causal link between Dr. Manuel's failure to timely diagnose Snyder's heart attack and the Plaintiffs' damages. Conversely, Dr. Manuel argues that even when construing the evidence in a light most favorable to Plaintiffs, reasonable minds could not conclude that the occlusion causing Snyder's heart attack could be opened in time to prevent clinically significant injury to her heart. Based on the following, we agree with the Plaintiffs.

{¶16} A trial court properly grants a motion for directed verdict when it has been "properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party[.]" Civ.R. 50(A)(4). In deciding a motion for a directed verdict, the trial court must assume that the evidence presented by the nonmovant is true, must give the nonmovant the

-11-

benefit of all reasonable inferences to be drawn from that evidence, and ascertain whether any substantial probative evidence supports the nonmovant's claim. *E.g.*, *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68-69 (1982).

{¶17} A motion for a directed verdict presents a question of law. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 4, citing *O'Day v. Webb*, 29 Ohio St.2d 215 (1972), paragraph three of the syllabus. As such, we review a trial court's decision to grant or deny the motion de novo. *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 76 Ohio St.3d 521, 523 (1996).

{¶18} "In order to establish medical malpractice, a plaintiff must demonstrate three elements: (1) the applicable standard of care, typically through expert testimony, (2) the defendant's negligent failure to render treatment in conformity with the applicable standard of care, and (3) that the defendant's negligence proximately caused the resulting injury." *Martin v. Hixenbaugh*, 179 Ohio App.3d 49, 2008-Ohio-5397, ¶ 11 (3d Dist.), citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976), paragraph one of the syllabus.

{¶19} Here, the trial court granted Dr. Manuel's directed verdict on the issue of causation. Accordingly, our review is limited to determining whether, after construing the evidence in Plaintiffs' favor, there was any substantial

probative evidence that Dr. Manuel's alleged negligence proximately caused Plaintiffs' alleged damages.

**{¶20}** While difficult to define, proximate cause is generally established "'where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act.'" *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981), quoting *Clinger v. Duncan*, 166 Ohio St. 216, 217, 223 (1957). The Ohio Jury Instructions defines proximate cause as "an act or failure to act that in the natural and continuous sequence directly produced the (injury) (death) (physical harm) and without which it would not have occurred." OJI CV 405.01(2). To establish proximate cause a plaintiff must present evidence upon which the trier of fact can reasonably determine that "'it is more likely than not that the negligence of a defendant was the direct or proximate cause of plaintiff's injury.'" *Whiting v. Ohio Dept. of Mental Health*, 141 Ohio App.3d 198, 203 (10th Dist. 2001), citing *Stone v. Davis*, 66 Ohio St.2d 74, 82 (1981). "'[W]here no facts are alleged justifying any reasonable inference that the acts or failure of the defendant constitute the proximate cause of the injury there is nothing for the jury [to decide], and, as a matter of law, judgment must be given for the defendant.'" *Kemerer v. Antwerp Bd. of Edn.*, 105 Ohio App.3d 792, 796 (3d Dist. 1995), quoting *Case v. Miami Chevrolet Co.*, 38 Ohio App. 41, 45-6 (1st Dist. 1930).

{¶21} Construing the evidence in Plaintiffs' favor, reasonable minds could conclude that clinically significant injury to Snyder's heart could have been avoided if the occlusion causing her heart attack was opened within four hours of the heart attack's onset. Dr. Magorien testified that Snyder's heart attack was caused by a complete occlusion of her LAD artery. On direct examination, Dr. Magorien testified that in cases where the heart attack is caused by a complete occlusion "the vast majority of injury [to the heart] occurs in the first two to three hours." Trial Tr., p. 35. On cross-examination, however, Dr. Magorien elaborated on the foregoing testimony, explaining:

> [W]hen you have a total obstruction * * * that process of irreversible damage is very rapid, 30, 60, 90, by 120 minutes you get a major amount of irreversible damage. It may continue out through four to five hours, beyond four hours there is no evidence that treatment improves survival from the initial clinical trials because the damage is likely irreversible and very extensive at that time. *Id.* at p. 48.

Also on cross-examination, Dr. Magorien agreed "to a reasonable degree of probability" that clinically significant injury to Snyder's heart occurred within the first four hours of its onset. *Id.* at p. 50. Given the foregoing and construing it in Plaintiffs' favor, we find reasonable minds could conclude that clinically significant injury to Snyder's heart could have been avoided if the occlusion was opened within four hours of the heart attack's onset.

{¶22} Bearing this four hour timeframe in mind, we turn to the facts to determine whether reasonable minds could conclude that but for Dr. Manuel's

-14-

alleged negligence (i.e., delayed diagnosis) the occlusion causing Snyder's heart attack could have been opened within four hours of the heart attack's onset.

{¶23} According to Dr. Manuel, when viewing the evidence in a light most favorable to Plaintiffs, there would have been a four hour and 39 minute delay from the onset of the heart attack until the LAD artery was opened. Specifically, Dr. Manuel maintains that the following timeline of events represents the most favorable timeline for Snyder:

> 8:23 a.m. – The very latest time at which Snyder's heart attack would have started.
> 9:19 a.m. – The earliest time Snyder met Dr. Manuel at the hospital, triggering a duty to send her to the emergency department or otherwise work her up for a heart attack.
> 9:34 a.m. – The earliest time at which an EKG could be completed and a positive result achieved.[5]
> 1:02 p.m. – The earliest time at which the occlusion would be opened. Appellee's Br., p. 13.

Given this timeline of events, Dr. Manuel argues that all of the clinically significant injury would have occurred even if he followed the standard of care, as articulated by Dr. Masterson, and sent Snyder to the emergency department or immediately initiated a cardiac work-up upon her arrival in the admissions office. As a result, Dr. Manuel maintains that even if he is found to have been negligent, his negligence was not the proximate cause of Plaintiffs' damages.

---

[5] At trial, Dr. Magorien testified that in his experience an EKG can be completed in "15 to 30 minutes." Trial Tr., p. 55. Hence, construing the evidence in Plaintiffs favor, Dr. Manuel properly relies on the fifteen minute figure in determining the earliest time Snyder could have received a positive EKG result.

{¶24} Construing the evidence in Plaintiffs' favor, we agree with the first three points in time detailed above, i.e., 8:23 a.m., 9:19 a.m., and 9:34 a.m., but find reasonable minds could conclude that the occlusion could have been resolved as soon as 11:59 a.m., not 1:02 p.m. In concluding that Snyder's occlusion would have been opened at 1:02 p.m., Dr. Manuel relied on the time it took from the positive EKG (6:45 p.m.) to the time when the occlusion was opened (10:13 p.m.), which amounts to three hours and 28 minutes. Dr. Manuel's reliance on this period of time, however, is questionable. This position assumes that Snyder was rushed to the catheterization laboratory immediately following the positive EKG. However, as the record stands, there is no evidence that Snyder was rushed to the catheterization laboratory after the positive EKG. Instead, the evidence reveals that Snyder, for reasons unknown, remained on the hospital floor until she was transferred to the cardiac care unit at 7:48 p.m. and then onto the catheterization laboratory.[6] Accordingly, reasonable minds could conclude that one hour and three minutes of Dr. Manuel's three hour and 28 minute figure was not spent in the catheterization laboratory.

{¶25} Considering Dr. Masterson's testimony, reasonable minds could conclude that Snyder should have been taken to the catheterization laboratory much sooner than one hour and three minutes after the positive EKG. According

---

[6] Though there was no evidence at trial concerning the exact time when Snyder entered the catheterization laboratory, we will assume, for purposes of this appeal, that she entered the catheterization laboratory at 7:48 p.m.

to Dr. Masterson, based on his understanding of the facts, Dr. Manuel should have sent Snyder to the emergency department or immediately initiated a cardiac work-up when she arrived in the admissions office. In either scenario, when the evidence is construed in Plaintiffs' favor, reasonable minds could conclude that Snyder could have been taken to the catheterization laboratory much sooner than one hour and three minutes after the positive EKG. At trial, there was general agreement among the medical experts that medical treatment happens quicker in an emergency department than on a hospital floor. Accordingly, had Snyder been sent to the emergency department, reasonable minds could conclude that she would have been taken to the catheterization laboratory in under one hour and three minutes after the positive EKG.

{¶26} The same is true if Dr. Manuel decided to immediately initiate a cardiac work-up. Dr. Masterson testified that "[t]he standard of care for [an] acute heart attack is aspirin when you first see the patient, *and getting them to the cardiac catheterization laboratory in under 45 minutes*." (Emphasis added.) Trial Tr., p. 311. Had Dr. Manuel followed the foregoing standard of care, reasonable minds could conclude that Snyder would have been taken to the catheterization laboratory well under one hour and three minutes after the positive EKG. Given the foregoing and construing the evidence in Plaintiffs' favor, we find reasonable minds could conclude that had Dr. Manuel followed the standard of care, as

articulated by Dr. Masterson, Snyder, under the best case scenario, would have been rushed to the catheterization laboratory after the positive EKG, thus avoiding the one hour and three minute delay.

{¶27} When we subtract one hour and three minutes from Dr. Manuel's figure of three hours and 28 minutes we find that the occlusion could have been opened within two hours and 25 minutes of the positive EKG. When we add two hours and 25 minutes to 9:34 a.m., which represents the earliest time for a positive EKG result, we find that the occlusion could have been opened as soon as 11:59 a.m. or three hours and 36 minutes after the onset of the heart attack.

{¶28} Given the foregoing, we find that reasonable minds could have concluded that but for Dr. Manuel's alleged negligence the occlusion could have been opened well within the four hour timeframe prescribed by Dr. Magorien, thus avoiding some clinically significant injury to Snyder's heart and any other damages attendant to such injury. Consequently, we find that the trial court erred in granting a directed verdict in favor of Dr. Manuel as there was substantial probative evidence presented at trial on the issue of causation.

{¶29} In so finding, we emphasize that our opinion should not be read as definitively establishing the time at which any event occurred on February 13, 2009 or the timeframe in which the occlusion could have been opened. Instead, our opinion is merely intended to demonstrate that when the evidence presented at

trial is viewed in a light most favorable to the Plaintiffs, reasonable minds could have concluded that but for Dr. Manuel's alleged negligence some clinically significant injury to Snyder's heart could have been prevented.

{¶30} Accordingly, we sustain Plaintiffs' first and second assignments of error.

*Assignment of Error No. III*

{¶31} In their third assignment of error, Plaintiffs contend that the trial court erred when it limited the scope of Dr. Janiak's testimony. Based on the following, we disagree.

{¶32} Trial courts have broad discretion in the admission and exclusion of evidence. *E.g.*, *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. Absent an abuse of discretion, a reviewing court will not reverse a trial court's ruling concerning the admissibility of evidence. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *See State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶ 16-18, citing *Black's Law Dictionary* 11 (8 Ed.Rev.2004). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Nagle*, 11th Dist. No. 99-L-089 (June 16, 2000), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶33} Prior to trial, Dr. Manuel filed a motion in limine requesting, in relevant part, that the trial court preclude Dr. Janiak from testifying. The trial court determined that "Dr. Janiak may testify as to what standard of care *any* physician in general may be held to in diagnosing a heart attack[,]" but "will *not* be permitted to testify as to the standard of care as it pertains to an emergency room doctor." (Emphasis sic.) (Docket No. 131, p. 5).

{¶34} At trial, after Dr. Janiak's cross-examination, Plaintiffs requested the trial court to reconsider its ruling limiting Dr. Janiak's testimony. Plaintiffs argued that Dr. Manuel's cross-examination of Dr. Janiak opened the door to ask questions about standard of care. In response, the trial court denied Plaintiffs' request, stating:

> As I told you in my ruling, you can ask him what opinions he has as to a general doctor, what a doctor is taught, what a doctor should know. It's just not an emergency room case. You can't illicit (sic) an opinion from him that comes about because of his emergency room experience. If this had gone through the emergency room then we [would want to] know what an emergency room doctor standard of care was or should be. I'm not limiting you in the context of what he can tell us as a practicing physician. Trial Tr., p. 240.

{¶35} We find that the trial court did not abuse its discretion when it limited Dr. Janiak's testimony. As previously noted, in order to establish a medical malpractice claim the plaintiff must, in relevant part, establish the applicable standard of care and the defendant's negligent failure to render treatment in conformity with the applicable standard of care. Contrary to

Plaintiffs' arguments, the applicable standard of care in this matter is one a hospitalist is expected to practice, not an emergency room physician. As the trial court noted, the standard of care expected of an emergency room physician would be applicable if an emergency room physician, as opposed to a hospitalist, had negligently failed to diagnose Snyder's heart attack. Since that is not the case, we find that the trial court did not abuse its discretion when it limited Dr. Janiak's testimony.

{¶36} Furthermore, we find that the Plaintiffs' were not prejudiced by the limitation of Dr. Janiak's testimony. At the core of Plaintiffs' claim is the notion that had Dr. Manuel immediately sent Snyder to the emergency room, she would have avoided some of the clinically significant injury to her heart. In order to convince the trier of fact that this course of action would have avoided some of the clinically significant injury, the Plaintiffs' had to demonstrate that medical care activities, such as diagnosis, happen quicker in an emergency room. Upon review of the record, we find that the limitation on Dr. Janiak's testimony did not preclude the Plaintiffs' from establishing this fact. Indeed, the record reveals that there was an agreement among the medical experts and parties that medical treatment happens quicker in an emergency room than on the hospital floor. Consequently, we find that the Plaintiffs' were not prejudiced by the trial court's limitation of Dr. Janiak's testimony.

**{¶37}** Accordingly, we overrule the Plaintiffs' third assignment of error.

**{¶38}** Having found no error prejudicial to the Plaintiffs herein, in the particulars assigned and argued in the third assignment of error, but having found error prejudicial to the Plaintiffs, in the particulars assigned and argued in the first and second assignments of error, we affirm in part, and reverse in part, the judgment of the trial court, and remand this matter for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**